IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EL BOR CORP. d/b/a JUNIATA FITNESS, | : : : | CIVIL ACTION NO. 09-5005 |
| Plaintiff, | : : | |
| v. | : : | |
| FIREMAN'S FUND INSURANCE COMPANY, | : : : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              MAY 6, 2011

## I.  INTRODUCTION

Plaintiff El Bor Corporation d/b/a Juniata Fitness ("Plaintiff") brings this insurance contract action against Fireman's Fund Insurance Company ("Defendant").  Plaintiff alleges that Defendant, in bad faith, breached its contractual obligations by failing to indemnify covered losses at Plaintiff's Juniata Fitness gym facility ("Juniata").  Juniata is owned and operated by Glenn Roble, who agreed to have a property damage claim submitted on Juniata's behalf by Metro Public Adjustment, Inc. ("Metro").

Plaintiff pleads two counts:  (1) Count One—breach of contract; and (2) Count Two—bad faith conduct in violation of 42 Pa. Cons. Stat. § 8371.  Defendant moves for summary judgment, urging that the undisputed evidence of record demonstrates that

Defendant neither breached its obligations under the contract nor exercised any bad faith in resolving Plaintiff's claim. For the reasons set forth below, Defendant's motion will be granted in part and denied in part.

**II. BACKGROUND**

A. <u>The Insurance Policy</u>

Defendant issued an insurance policy to Plaintiff, insuring Juniata in the amount of $1,000,000. (Pl.'s Resp. In Opp., Ex. A, at FFIC-262.) The policy covers "risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." (<u>Id.</u> at FFIC-295.)

Amongst others, the policies' exclusions include "loss or damage caused directly or indirectly by": (1) "contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust . . . in covered property that causes it to damage or destroy itself"; (2) defects, errors and omissions, negligent or otherwise, in the "design, specification, construction, workmanship, installation, or maintenance of the property"; (3) the insured's "neglect to use all reasonable means to save covered property at and after the time of loss"; (4) "continuous or repeated seepage or leakage of water or steam that occurs over a period of 14 days or more"; (5) "settling, cracking, shrinking, bulging, or expanding of . . . roofs"; and

(6) "wear and tear." (Id. at FFIC-295, FFIC-298, FFIC-299, FFIC-300.)

In addition to the abovementioned exclusions, the policy contains a provision barring "a legal action" against Defendant unless "all of the 'terms' of the Commercial Output Program coverages have been complied with." (Id. at FFIC-308.) These terms include providing Defendant with "prompt notice" of a claim, and taking "reasonable steps to protect covered property at and after an insured loss to avoid further loss." (Id. at FFIC-303.)

B. The Damage and Juniata's Arrangement with Metro

In early 2009,[1] Roble noticed staining on Juniata's ceiling. (See Def.'s Mot. For Summ. J., Ex. A-3, at 23.) Roble did not call Defendant to apprise it of a possible loss in response to the staining because he "didn't think that it was going to be that big of a thing" and "thought it was just a little excess of rain." (Id. at 25.) Roble similarly opted not to undertake any corrective action on Juniata's roof at this time. (See id. at 29.) Sometime thereafter, the stains on the ceiling started to leak. (See id. at 27.) Initially, Roble did not contact Defendant to apprise it of a potential claim. (See

---

[1] The evidentiary materials of record are vague concerning many of the relevant dates.

id. at 29.)

In February 2009, however, Roble decided to do so after he was approached by Angel Bernardy, a claim solicitor for Metro. (See id., Ex. A-1, at 20, 32, 40.) As a claim solicitor, Bernardy's role was to "go find damage in houses and make sure -- offer to people, representation for their claims." (Id. at 20.) Bernardy spoke with Roble about the possibility of signing up for Metro's services, and Roble permitted Bernardy to inspect Juniata to look for damage. (Id. at 32-33, 35.) That same day, Bernardy contacted roofer Steve Price to arrange an initial consultation. (Id. at 40.) After inspecting Juniata's roof, Price performed $250 worth of emergency repairs "due to weight of ice, and snow damage." (Id., Ex. A-6; see id., Ex. A-1, at 41; Pl.'s Resp. In Opp., Ex. C, at 32.)

Following these emergency repairs, Bernardy and Roble spent "about a month" negotiating Metro's fee. (Def.'s Mot. For Summ. J., Ex. A-1, at 33.) During the pendency of negotiations, no additional repairs were undertaken, no portions of Juniata were closed, and no patrons cancelled their gym memberships due to the roof's damage. (Id., Ex. A-3, at 48.) Finally, on March 31, 2009, Roble and Metro came to an agreement whereby Metro would adjust Juniata's claim in exchange for twenty percent of any recovery from Defendant. (Id., Ex. A-5, at 25.) This agreement, which was signed by Bernardy and Roble, listed the

4

date of loss as January 28, 2009, indicating that the damage to Juniata was caused by wind, rain, and ice. (See id., Ex. A-7.) The parties, however, were unable to identify the specific day on which the loss occurred. Consequently, Metro checked the weather records and selected a date that corresponded with Price's finding that excess snow and ice caused the damage. (See id., Ex. A-1, at 52; id., Ex. A-5, at 42-43.)

### C. The Insurance Claim

Defendant was first apprised of the claimed loss on April 17, 2009, when Metro contacted Defendant to alert it of the claim. (See id., Ex. B-2, at FFIC-13, FFIC-15.) That same day, Metro sent a letter to Plaintiff acknowledging that Plaintiff had retained Metro's services, and stating that Metro had "filed [Plaintiff's] claim, on [Plaintiff's] behalf, with [Plaintiff's] insurance company." (Id., Ex. A-7.) Like the contract Bernardy and Roble had signed on March 31, 2009, Metro's letter to Plaintiff listed the loss date as January 28, 2009, and cited wind, rain, and snow as the cause of the loss. (Id.)

By May 4, 2009, however, Defendant had still not received an estimate of damages and contacted Metro to inform it that such information was necessary to process the claim. (See id., Ex. B-2, at FFIC-12.) Finally, on May 18, 2009, Metro advised Defendant that the total coverage would be over $125,000.

5

(See id. at FFIC-10.) This figure reflected a May 11, 2009 report prepared by Metro that estimated the damages attendant to Plaintiff's claim. Amongst other things, Metro's report indicated that the following services were needed: (1) replacement of the roof for $125,000; (2) resetting of the mirrors in the cardio room for $4,293.90; (3) painting the walls of the weight room with epoxy coating for $6,476.80; (4) repairing the pro shop's ceiling for $1,567.78; and (5) replacing the pro shop's wallpaper for $2,311.35. (See id., Ex. B-3.)

The roof replacement called for by Metro's report was based on Price's finding that the roof was damaged by snow and ice. Price, however, did not see any snow or ice when he inspected the roof. (See Pl.'s Resp. In Opp., Ex. C, at 38.) Nevertheless, he believed that (1) snow and ice caused the damage he observed; (2) the roof was not improperly constructed; and (3) the damage sustained ultimately required the roof's replacement. (See id. at 42, 55-56.) Price also believed that the water damage inside Juniata matched the damage to the roof. (See id. at 67-68.) He estimated that replacing the roof would cost $125,000, though he recognized that Roble was not keen on undertaking a full replacement in the immediate future. (See id., Ex. B-4; id., Ex. C, at 50.)

On June 4, 2009, Defendant assigned an independent adjuster to inspect the property, and the independent adjuster

did so on June 9, 2009. (See Def.'s Mot. For Summ. J., Ex. B-4, at FFIC-161.) By July 17, 2009, the independent adjuster had asked Defendant to retain an expert to inspect the roof, and contacted Metro to ask them to "refrain from work to the roof" until an inspection was completed. (See id., Ex. B-5, at FFIC-156.) On August 11, 2009, Metro followed up with Defendant because it had "not heard from anyone." (Pl.'s Resp. In Opp., Ex. B-6, at FFIC-145.) That same day, the independent adjuster filed a report stating that he was still "awaiting direction on [the] recommendation to assign an engineer and/or building consultant to assist . . . in the investigation of this matter." (Id., Ex. B-6, at FFIC-148.) On August 12, 2009, an engineer was assigned to the case. (Def.'s Mot. For Summ. J., Ex. B-6, at FFIC-33.)

Later in August 2009, Plaintiff retained counsel who ultimately filed this suit on September 29, 2009. (See doc. no. 1.) Thereafter, the independent adjuster contacted Metro to arrange an inspection of Juniata. (See Def.'s Mot. For Summ. J., Ex. A-5, at 100-01.) This request was denied because Plaintiff was represented by counsel in a pending lawsuit. (See id.) Plaintiff's counsel, however, communicated with the independent adjuster and scheduled an October 6, 2009 inspection. (See id., Ex. B-6, at FFIC-32; id., Ex. B-9, at FFIC-45.)

The engineer assigned to the case inspected Juniata's

roof and interior, concluding in an October 19, 2009 report that "the roof systems on the . . . building had been poorly constructed and inadequately maintained." (Id., Ex. B-9, at FFIC-44.) The engineer also opined that "[t]he weight of the accumulated snow and ice during the end of January of 2009 was insufficient to cause the movement of structural members necessary to have resulted in the observed damage locations." (Id.) Based on this report, Defendant issued a May 7, 2010 letter generally denying Plaintiff's claim but agreeing to pay $9,715.99 to repair "internal water damages." (Id., Ex. B-10.)

**III. DISCUSSION**

    A.    <u>Legal Standard</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 581 (3d Cir. 2009) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a

8

verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

B. Application

Defendant argues it is entitled to judgment on each of Plaintiff's claims. The analysis that follows begins by addressing Plaintiff's contract claim before turning to Plaintiff's bad faith claim.

1. Plaintiff's Contract Claim

a. Plaintiff's alleged failure to comply with the policy

As a preliminary matter, Defendant urges that the Court need not reach the merits of Plaintiff's contract claim because

9

it is barred by Plaintiff's failure to comply with the insurance policy. Specifically, Defendant argues that Plaintiff failed to comply with policy provisions requiring it to: (1) give prompt notice of the claim; (2) protect the property at issue; (3) permit inspection of the property; and (4) cooperate during the adjustment. Therefore, as Defendant reasons, summary judgment should be granted in its favor. Defendant is mistaken.

First, even assuming that Plaintiff's failure to report the claim until April 2009 did not comply with the contract's prompt notice provision, Defendant has submitted no evidence that it was prejudiced by Plaintiff's delay. This defeats Defendant's notice defense. See Brakeman v. Potomac Ins. Co., 371 A.2d 193, 198 (Pa. 1977); see also Berko Invs., LLC v. State Nat'l Ins. Co., No. 08-2609, 2010 WL 2853731, at *5 (E.D. Pa. July 21, 2010) (to assert a late notice defense, the insurer must prove both that the insurance contract had a notice provision and that the insured's failure to comply with it "resulted in actual prejudice"). After all, other than the $250 emergency repairs Plaintiff undertook, the roof and interior of Juniata was in substantially similar condition when it was ultimately inspected by Defendant. Cf. Berko, 2010 WL 2853731, at *6-7 (finding actual prejudice where the insured had the entire roof replaced before the insurer had an opportunity to inspect it).

Second, although the evidence of record suggests that

Plaintiff could have taken more steps to protect the property, there is also evidence that Plaintiff had the $250 emergency repairs completed in February 2009. Because the Court is tasked with viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in its favor, the evidence concerning the emergency repairs suffices to create a factual question as to whether Plaintiff exercised its duty to protect covered property. For this reason, Plaintiff's alleged failure to comply with the policy's property protection provision is not grounds for granting summary judgment in Defendant's favor.

Finally, Defendant's claims that Plaintiff impeded Defendant's inspection and failed to cooperate during the adjustment cannot be credited. Defendant argues that both bases bar Plaintiff's contract claim, urging that "Metro, on behalf of Plaintiff, admittedly impeded the property inspection by Fireman's Funds' independent adjuster and roofing consultant." (Def.'s Mot. For Summ. J., at 18.) As support for this proposition, Defendant cites testimony from a Metro representative in which the representative stated that he denied Defendant's representatives access to Juniata. (See id. (citing id., Ex. A-5, at 100-01).)

In doing so, however, Defendant omits a very important detail: the witness in the cited passage clearly stated that he denied Defendant access only after the case was "in suit" when

11

Metro was "no longer representing Juniata." (Id.)  Indeed, by this point, Plaintiff was represented by counsel who had sent Defendant's adjuster a letter to that effect.  (See id., Ex. B-7, at FFIC-128.)  Thus, Defendant's representation that Plaintiff failed to comply with the policy because Metro refused to permit inspection is less than candid.[2]  Plaintiff's counsel, who appears to have readily complied with Defendant's every request, was the proper party for Defendant to contact for access to Juniata.

Because Defendant cannot show that Plaintiff is barred from bringing this action due to its failure to comply with the insurance policy, the Court turns to address the merits of Plaintiff's contract claim.

### b. The merits of the contract claim

Defendant next argues that Plaintiff's contract claim fails on the merits because (1) Plaintiff cannot show that the damage was caused by the "weight of ice and snow" in January 2009; and (2) Plaintiff's claim falls within six different policy exclusions.  Alternatively, Defendant asks the Court to grant partial summary judgment as to certain of the damages itemized in

---

[2] The Court presumes Defendant's reference to this testimony was not a knowing attempt to mislead the Court.  See Pa. R.P.C. 3.3(a)(1).

the May 11, 2009 report prepared by Metro.[3]  Although not explicit, each of Defendant's requests blithely ignores the summary judgment standard by asking the Court to view the facts in the light most favorable to Defendant and grant Defendant's motion on that basis.

For example, Defendant's contention that Plaintiff's claim fails because "no one knows how long, or how, the roof was damaged," (Def.'s Mot. For Summ. J., at 19), implicitly asks the Court to reject Price's testimony that the roof was damaged by snow and ice.  (See Pl.'s Resp. In Opp., Ex. C, at 42, 55-56.)  Defendant asks the Court to weigh various pieces of evidence in this manner.  (See, e.g., Def.'s Mot. For Summ. J., at 23 ("Damage to the wallpaper . . . and the weight room . . . were more likely caused by age than by any water damage.").)  While Defendant presents some good reasons to discredit the evidence supporting Plaintiff's position that a jury may well accept, the

---

[3]  To the extent it differs from Defendant's broader argument in support of summary judgment on Count One, Defendant's request for partial summary judgment is largely based on Roble's admissions that certain of the repairs in Metro's report (mostly concerning Juniata's interior) are unnecessary or unwanted. However, the fact that Roble may now feel this way does not mean Plaintiff did not have a cognizable insurance claim that Defendant improperly denied.  Moreover, as it pertains to the damage to Juniata's interior, Price's testimony creates a factual dispute for the jury to consider.  (See Pl.'s Resp. In Opp., Ex. C, at 67-68 (stating the damage in the interior matched the roof's damage).)  For these reasons, the Court declines to enter piecemeal partial summary judgment on Plaintiff's breach of contract claim.

13

Court is not permitted to accept Defendant's invitation. Instead, it must view the evidence in the light most favorable to Plaintiff and draw all inferences in its favor. Under this standard, Price's testimony that the roof was damaged by snow and ice plainly permits a reasonable jury to conclude that the roof was damaged by snow and ice. Coupled with Roble's testimony that he first observed staining on the walls in early 2009, a reasonable jury could find that the damage surfaced when Plaintiff was insured by Defendant.

The same flaw also appears in Defendant's discussion regarding five of the six policy exclusions. Defendant's dependence on the "neglect" exclusion ignores the evidence that Plaintiff undertook $250 in emergency repairs. Defendant's reliance on the "construction defect" and "seepage" exclusions again credits Defendant's engineering expert whilst ignoring Price's conflicting testimony. (See Pl.'s Resp. In Opp., Ex. C, at 42 (stating the roof was not poorly constructed and that the crack in the roof was not a product of seeping).) Similarly, Defendant's argument that the "contamination and deterioration" and "wear and tear" exclusions apply because certain damage may have predated the roof damage ignores Roble's explanation that things became worse after Juniata began experiencing problems with its roof. (See Def.'s Mot. For Summ. J., Ex. A-3, at 85-86.) These contentions also ignore Price's testimony that the

14

water damage inside Juniata corresponded to the damage to the roof. (See Pl.'s Resp. In Opp., Ex. C, at 67-68.) Given this testimony, a reasonable jury could find that the damage to Juniata's interior was caused by the damage on the roof, not the preexisting mold or ordinary wear and tear.

Defendant's sixth and final basis for deeming Plaintiff's claim excluded—namely, that the "settling" exclusion applies—is sheer speculation that does not meet Defendant's burden of establishing that "the loss falls within a specific policy exclusion." Wexler Knitting Mills v. Atl. Mut. Ins. Co., 555 A.2d 903, 905 (Pa. Super. Ct. 1989). Pointing to Roble's testimony that he was not sure whether the damage was caused by the roof's settling, Defendant asserts the claim "could have been denied." (Def.'s Mot. For Summ. J., at 23.) However, the fact that Roble testified that he did not know if the leaking was a product of the roof settling plainly does not meet Defendant's burden of establishing that the settling exclusion applies. Especially given Roble's acknowledgment that he lacked any knowledge or expertise in roofing.

For these reasons, Defendant's motion for summary judgment will be denied as to Plaintiff's contract claim.

2. Plaintiff's Bad Faith Claim

Defendant also seeks summary judgment as to Plaintiff's

15

claim that Defendant exercised bad faith in denying Plaintiff's insurance coverage. See 42 Pa. Cons. Stat. § 8371. To establish a claim for bad faith denial of insurance coverage under Pennsylvania law, a plaintiff must show "with clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997); see Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994). "Clear and convincing evidence is evidence that is 'so clear, direct, weighty and convincing as to enable the [fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" Burrell v. United Healthcare Ins. Co., No. 00-4697, 2001 WL 873221, at *1 (E.D. Pa. July 30, 2001) (Robreno, J.) (quoting U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 309 (3d Cir. 1985)).

Here, Plaintiff argues that Defendant "acted in a totally dilatory, deceitful and malicious manner" by (1) ignoring Plaintiff's claim for months; (2) issuing a denial letter several months after receipt of the engineering expert's report; and (3) relying on policy exclusions that do not apply in its denial letter. (Pl.'s Resp. In Opp., at 15.) The evidentiary materials do not provide clear and convincing support for these

contentions.

First, although Defendant was responsible for some of the delay in adjusting Plaintiff's claim, (see id., Ex. B-6, at FFIC-133 (lamenting that Plaintiff's claim "fell through the cracks")), there is no evidence this delay was knowing or reckless, see 3039 B St. Assocs., Inc. v. Lexington Ins. Co., 740 F. Supp. 2d 671, 677 (E.D. Pa. 2010) (Robreno, J.) ("[M]ere negligence or bad judgment is not bad faith." (quoting Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994))). Second, the seven month delay in processing Plaintiff's claim after receipt of the expert report is "not indicative of bad faith." Morrisville Pharm., Inc. v. Hartford Cas. Ins. Co., No. 09-2868, 2010 WL 4323202, at *5 n.40 (E.D. Pa. Oct. 29, 2010); see id. (agreeing with cases holding that "spans of thirteen to fifteen months to process claims are reasonable").

Finally, it cannot be said that Defendant's reliance on the policy exclusions cited was unreasonable. Defendant's engineer found that the weight of the snow and ice could not have caused the damage to Juniata's roof, and noted the roof was poorly constructed and maintained. (See Def.'s Mot. For Summ. J., Ex. B-9, at FFIC-44.) These findings, which were cited in the denial letter, provide reasonable grounds to deny benefits. See Cantor v. Equitable Life Assurance Soc'y of the U.S., No. 97-5711, 1999 WL 219786, at *3 (E.D. Pa. Apr. 12, 1999) ("Courts

17

repeatedly have held that an insurance company's substantial, thorough investigation, based upon which the insurance company refuses to make or continue benefit payments, establishes a reasonable basis that defeats a bad faith claim.").

Because Plaintiff has failed to point to any evidence from which a jury could clearly and convincingly find that Defendant lacked a reasonable basis for denying benefits and knew or recklessly disregarded its lack of a basis, the Court will grant Defendant's motion as to Plaintiff's bad faith claim.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part. An appropriate Order will follow.